# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**ELIZABETH MCQUITTY**
**and WILLIS MULLINS,**

      **Plaintiffs,**

**v.**                                                                    **No. 13-CV-0932 MCA/GBW**

**TROPICANA ENTERTAINMENT,**
**INC.,**

      **Defendant.**

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on *Plaintiffs' Motion for Sanctions and Adverse Inference Arising from Defendant['s] Spoliation of Evidence or, in the [Alternative], Motion to Conform the Pleadings to the Evidence or to Amend the Complaint to Add a Spoliation Claim* [Doc. 80]; *Tropicana Express, LLC's Motion to Bar Expert Testimony* [Doc. 58]; *Tropicana Express, LLC's Motion for Partial Summary Judgment on Intentional Tort, UPA, and Punitive Damages Claims* [Doc. 84]; *Tropicana Express, LLC's Motion for Partial Summary Judgment on Negligence Claim* [Doc. 86]; and *Plaintiffs' Motion for Partial Summary Judgment* [Doc. 88].  The Court hereby **DENIES** Plaintiffs' motions and **GRANTS** Defendant's motions.  Given the rulings above, the remaining motions on the docket are moot.  [Doc. 83; Doc. 78]

## FACTUAL BACKGROUND

Mr. Mullins and Elizabeth McQuitty stayed in room 624 of Defendant's Tropicana hotel in Laughlin, Nevada, from December 14 to December 17, 2011.  [Doc. 85, UMF 1;

1

Doc. 107, p. 2 ¶ 1]  Neither Mr. Mullins nor Ms. McQuitty paid for the room, nor did they have an obligation to gamble at the Tropicana casino.  [Doc. 85, ¶¶ 4, 5]  Defendant comped[1] Plaintiffs' room "to encourage Plaintiffs to spend their money gambling at Defendant's casino," which Plaintiffs did.  [Doc. 85, ¶¶ 4, 5; Doc. 107, pp. 3-4, ¶¶ 4-5]  Ms. McQuitty[2] was bitten hundreds of times by bedbugs (*Cimex lectularius*) while staying at the Tropicana, and Mr. Mullins had several bites.  [Doc. 88, ¶¶ 11-12; Doc. 108, ¶¶ 11-12]  Ms. McQuitty reported the bedbugs to Defendant on December 21, 2011.  [Doc. 102, ¶ 17; Doc. 126, ¶ 17]  Also on December 21, 2011, another customer reported to Defendant bedbugs in room 624.  [Doc. 102, ¶ 17; Doc. 126, ¶ 17]

Defendant's policy, after receiving a report of bedbugs in a room, is to take the room out of service and report the issue to its pest control contractor.  [Doc. 87, ¶ 7; Doc. 87-7; Doc. 102, ¶ 7]  If the pest control contractor finds bedbugs, the hotel takes the rooms on either side and above and below the positive room(s) out of service and treats them for bedbugs.  [Doc. 87, ¶ 8; Doc. 102, ¶ 8]  The rooms are not released to service until treated and inspected by the pest control contractor.  [Doc. 87, ¶ 8; Doc. 102, ¶ 8]  Defendant disposes of the mattress, box springs, linens, towels, "and other soft materials that are in the vicinity of the bed," though not the curtains.  [Doc. 87, ¶ 9; Doc. 102, ¶ 9]  In the instant case, Defendant discarded the mattresses, box springs and bedding that were in room 624.  [Doc. 80, ¶¶ 12-13; Doc. 89-2, pp. 9-10, 132:20 to 135:9]  Mr.

---

[1] Comp:  "vt. . . . to supply somebody with something that is complimentary or free (informal) [Late 19thC Shortening of complimentary]."  *Encarta World English Dictionary*, 369 (1999).

[2] Originally a Plaintiff herein, Ms. McQuitty resolved her dispute with Defendant after the present motions were filed.  [Doc. 136]

Mullins submits that Defendant's procedure is not sufficient by industry standards.  [Doc. 102, pp. 3-4, ¶¶ 7-9; Doc. 88, ¶ 6]  Mr. Mullins also submits that Defendant spoliated evidence by discarding the mattresses and box springs, by failing to take pictures of the mattresses, box springs and bedding, and by destroying a "maid inspector's report," which would have identified which of Defendant's housekeepers "were responsible for cleaning which rooms on the date Plaintiffs stayed at Defendant's hotel."  [Doc. 80, esp. ¶¶ 12-14]

The Tropicana has 1,487 rooms.  [Doc. 87, ¶ 2]  The parties agree that there is no way for Defendant to prevent guests from bringing bedbugs into the hotel.  [Doc. 87, ¶ 6; Doc. 102, p. 3 ¶ 6]  When cleaning rooms, Defendant's "housekeepers are expected to remove linens and towels and look for anything suspicious as far as bedbugs or anything on the bed."  [Doc. 87, ¶ 10 (internal quotation marks, citation and brackets omitted); Doc. 102, p. 4, ¶ 10]  The housekeeping supervisor's quality control consists only of offering training to ensure that the housekeepers are correctly performing the bedbug inspections and asking the housekeepers whether they are checking for bedbugs.  [Doc. 102, ¶ 10; Doc. 102-2, p. 9, 108:13 to 109:20]

Defendant submits that there were no reports of bedbugs in room 624 before Plaintiffs stayed in room 624.  [Doc. 87, ¶ 3]  Mr. Mullins argues that documents produced by Defendant do not list the room number for the rooms which were out of service due to bedbugs, but instead list the gross number of rooms out of service due to bedbugs without reference to room number.  [Doc. 102, p. 2, ¶ 3]  For example, "between 1/1/11 and 11/24/11, on 61 single days, between 4 and 18 rooms were listed as out of

service due to bed bugs—no room numbers listed." [Doc. 102, p. 3, ¶ 3] Accordingly, Mr. Mullins argues that "[u]nder the applicable summary judgment standard, it is appropriate for this Court to infer that there may have been undocumented employee complaints for room 624 and the hotel in general." [Doc. 102, p. 2 ¶ 3] Defendant counters, however, that it produced treatment logs from its pest control contractor which reflect the rooms treated by room number, and that there was no treatment of room 624. [Doc. 126, p. 2 ¶ 3] Thus, Defendant argues that Mr. Mullins failed to produce admissible evidence showing that there were reports of bedbugs in room 624 prior to his stay in the room. [Doc. 126, p. 2 ¶ 3]

Mr. Mullins has identified an expert entomologist to testify as to his opinion of the degree of the infestation in room 624 prior to Plaintiffs' stay in the room as well as industry practices with regard to bedbug management. [Doc. 102-3]

Plaintiffs brought this lawsuit in state court claiming negligence, battery, unfair trade practices and punitive damages. [Doc. 1-2, p. 6] Defendant removed the case from state court to this Court [Doc. 1], and then moved to dismiss Plaintiffs' claims for battery, punitive damages, and claims under the New Mexico Unfair Practices Act (NMUPA). [Doc. 5; Doc. 6] This Court dismissed Plaintiffs' unconscionable trade practice claim but did not dismiss Plaintiffs' claims for battery, punitive damages and unfair or deceptive trade practice under the NMUPA. [Doc. 116] Defendant did not at that time move to dismiss Plaintiffs' negligence claim.

Additional facts, as necessary, will be set forth below.

**ANALYSIS**

***Plaintiffs' Motion for Sanctions***

Mr. Mullins has filed a *Motion for Sanctions and Adverse Inference Arising from Defendant['s] Spoliation of Evidence or, in the [Alternative], Motion to Conform the Pleadings to the Evidence or to Amend the Complaint to Add a Spoliation Claim.* [Doc. 80] As an initial matter, the Court notes that, though this appears to be a discovery matter which was referred to the Magistrate under 28 U.S.C. § 636(b)(1)(A), Federal Rule of Civil Procedure 72(a) and Local Rule 73.1(a), the relief Mr. Mullins requests is intimately tied to the merits. Because he requests an adverse inference or leave to amend his complaint, the Court interprets Mr. Mullins' motion as a dispositive motion, and therefore a matter appropriate for decision by the Article III Judge. *See* Fed. R. Civ. P. 72(a).

"The district court has discretion to fashion an appropriate remedy depending on the culpability of the responsible party and whether the evidence was relevant to proof of an issue at trial." *Estate of Trentadue ex rel. Aguilar v. U.S.*, 397 F.3d 840, 862 (10th Cir. 2005). "A spoliation sanction is proper where (1) a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent, and (2) the adverse party was prejudiced by the destruction of the evidence." *Burlington N. & Santa Fe Ry Co. v. Grant*, 505 F.3d 1013, 1032 (10th Cir. 2007).

> [T]he general rule is that bad faith destruction of a document relevant to proof of an issue at trial gives rise to an inference that production of the document would have been unfavorable to the party responsible for its destruction. The adverse inference must be predicated on the bad faith of the party destroying the records. Mere negligence in losing or destroying records is not enough because it does not support an inference of consciousness of a weak case.

5

*Aramburu v. Boeing Co.*, 112 F.3d 1398, 1407 (10th Cir. 1997) (internal citations omitted).

Mr. Mullins argues that Defendant anticipated litigation as of December 21, 2011, the date that Ms. McQuitty reported the bedbug bites to Defendant.  [Doc. 80, ¶ 11; Doc. 80-4, p. 2; Doc. 104, pp. 4-7]  Mr. Mullins has produced no evidence that at the time Ms. McQuitty reported the incident to Defendant that she stated she intended to sue or was considering litigation.  [Doc. 80; Doc. 104] Instead, he points to Defendant's answers to interrogatories stating that Defendant and "its insurer initiated and maintained a claims log . . . reflecting activity conducted in anticipation of litigation" after receiving Plaintiffs' complaint.  [Doc. 80-4, p. 2; Doc. 104-2, p. 5]  Moreover, Plaintiffs asked "Please state the date Defendant anticipated litigation in this matter."  [Doc. 80-4, p. 2] Defendant answered:

> The claim first made by Elizabeth McQuitty on December 21, 2011 was referred by Defendant to its then-third-party administrator, as a potential legal claim.  The third-party administrator acted under the direction of Defendant's in-house risk management team and reported accordingly.
> Defendant became aware on or about September 4, 2013 that litigation had actually been filed.  Subsequent to that time, all claims activity continued in anticipation of litigation and/or in communication with counsel.

[Doc. 80-4, p. 2]

In its Response Brief, Defendant concedes that this interrogatory answer "stated that it anticipated litigation on the date that Plaintiffs first notified Tropicana of their alleged exposure to bedbugs."  [Doc. 95, p. 7]  Moreover, as stated above, Defendant

initially took the position that it anticipated litigation as of the date that Plaintiffs reported the bedbugs, and thus it initially claimed that its reports by its third-party claims administrator from December 2011 forward were privileged because they were created in anticipation of litigation.   [Doc. 95, p. 7]   Defendant now argues that it expressly withdrew such a position after a hearing on a motion to compel the third-party claims administrator's file.  [Doc. 95, p. 8]  The Court is not persuaded by Defendant's *post hoc* legal posturing.  Nonetheless, Defendant's answers to interrogatories are not informative of the question before the Court:  whether, at the time the evidence was destroyed, Defendant knew or had reason to know that litigation was imminent.  *Grant*, 505 F.3d at 1032.  Mr. Mullins, as the party seeking the adverse inference, has the burden of proving that Defendant acted in bad faith *at the time it destroyed or lost the evidence*.  *Turner v. Pub. Serv. Co. of Colorado*, 563 F.3d 1136, 1149 (10th Cir. 2009).

Mr. Mullins claims that Defendant was required to keep the mattresses, box springs and bedding.  [Doc. 80, p. 9]  However, by the time Ms. McQuitty reported the bedbugs, the bedding was already removed from the room and cleaned.  Further, through natural processes, the mattresses and box springs would not have remained in the same condition in which they were on December 21, 2011 until either Plaintiffs filed suit or until trial.  The bedbugs would have continued in their life cycle, growing, breeding, dying, and potentially destroying (or further destroying) the mattress.  Moreover, it was indisputably reasonable and appropriate for Defendant to remove the potentially infested mattresses and box springs from their property in order to protect other patrons and remedy the bedbug infestation.  Thus, there is no evidence that Defendant acted in bad

faith by destroying the mattresses and box springs, even if Defendant knew or should have known litigation was imminent.

Mr. Mullins next argues that Defendant should have photographed the above evidence.  [Doc. 9, p. 9]  Our Tenth Circuit has considered the fact that the non-moving party thoroughly documented the condition of the evidence (land being remediated) before and during its changes to the evidence in concluding that there was no prejudice to the party moving for a spoliation sanction.  *Grant*, 505 F.3d at 1032-33.  However, the parties have not cited, nor has this Court found, any case authorities which imposing on a party a duty to photograph or otherwise document evidence that will change conditions naturally prior to litigation.  Without such a duty, the Court is not persuaded that Defendant acted in bad faith by failing to photograph the evidence.  Rather than an adverse inference instruction, under the circumstances of this case argument to the jury concerning the Defendant's failure to photograph the evidence would be the most appropriate remedial measure.

As to the maid report, which purportedly would have revealed which maids were on duty on the dates that Plaintiffs stayed at the Tropicana, the Court concludes that Defendant did not know or have reason to know that the report would be pertinent to litigation.  Defendant is "not expected to be prescient."  *Hatfield v. Wal-Mart Stores, Inc.*, 335 Fed.Appx. 796, 804 (10th Cir. 2009) (unpublished decision) (declining to overturn the district court's denial of spoliation sanction where the defendant did not have reason to believe that the plaintiff would seek the particular evidence at issue).

For the foregoing reasons, *Plaintiffs' Motion for Sanctions and Adverse Inference*

*Arising from Defendant['s] Spoliation of Evidence or, in the [Alternative], Motion to Conform the Pleadings to the Evidence or to Amend the Complaint to Add a Spoliation Claim* is denied.

### Defendant's Motion to Strike Expert

Also before the Court is Defendant's Motion to bar Mr. Mullins' expert from testifying because he failed to disclose his expert within the deadline required by the Court and pursuant to Federal Rule of Civil Procedure 26.  [Doc. 58]  Again, because of the potential impact on the merits of this case, the Court construes this motion as dispositive.

Originally, the Court set the deadline for Plaintiff to disclose an expert witness and provide the expert witness report for April 7, 2014.  [Doc. 34]  On April 7, 2014, Plaintiff's Counsel filed an Unopposed Motion to extend his deadline until April 22, 2014, and Defendant's deadline to identify an expert and provide a report to May 22, 2014.  [Doc. 49]  Plaintiff's Counsel asked "additional time for their consultants to complete their report," despite diligence, and because of Plaintiff's Counsel's travel schedule.  [Doc. 49]  The Court granted the Motion.  [Doc. 50]  Mr. Mullins did not subsequently file a motion to enlarge his period to identify his expert or provide a report. April 22, 2014 passed without Plaintiffs providing their requisite expert disclosure.

On April 24, 2014, Magistrate Judge Gregory B. Wormuth held a hearing on a separate pending motion to compel, at which time Defendant stated that it still had not received Plaintiff's expert disclosure.  [Doc. 54, p. 5]  Plaintiff's Counsel stated that the disclosure would be sent to Defendant by the following day.  [Doc. 54, p. 5]  Despite

requests from Defendant for Plaintiff to produce the expert witness report, Plaintiff failed to do so by May 23, 2014, the date on which Defendant filed its motion to bar Plaintiff's expert testimony based on the above facts.  [Doc. 58; Doc. 59, pp. 2-3]

Mr. Mullins responds to Defendant's Motion to Strike by submitting that Plaintiff's Counsel had intended to retain a particular expert whom Plaintiff's Counsel had retained in numerous previous cases.  [Doc. 66, p. 1]  However, Defendant retained that expert first, even though Plaintiff's Counsel had other cases pending in which the expert was identified as a witness.  [Doc. 66, p. 3; Doc. 66-5, p. 5]  Plaintiff's Counsel does not disclose when he learned that his first choice of expert had been retained by Defendant.  On May 16, 2014, Plaintiff's Counsel set an email to Defendant's Counsel stating:

> After Dr. Pollak (*sic*) advised that he was not available, I contacted another expert witness.  That Florida expert is the gentleman with the personal family emergency.  After his emergency ended, the Florida expert sent me a draft report.  The report did not comply with the requirements for a Rule 26 disclosure.  I visited with the gentleman and he took several days to send me a revised report.  That revised report still did not comply with the requirements of rule 26.  After that I decided to retain a different expert.
>
> Plaintiffs have retained Mr. Doug Seemann.  I hope to have a sworn declaration of some type from him shortly.

[Doc. 59-1, p. 1]  Mr. Mullins argues that he had a good faith belief that Dr. Pollack would be his expert, and that Defendant created the delay by hiring Plaintiff's Counsel's usual expert.  [Doc. 66, p. 3]  Mr. Mullins also argues that their reason for failing to comply with the Court's deadline was substantially justified and there is no prejudice or surprise to Defendant.  [Doc. 66, pp. 5-6]  Mr. Mullins had not provided his expert report

by the date he responded to Defendant's Motion.  Nor, in his Response, did Mr. Mullins

ask for an extension or offer an estimate as to when he would be able to provide the

expert report.

As of June 20, 2014, the date Defendant filed its Reply on the *Motion to Bar*

*Expert Testimony*, Plaintiff still had neither requested an extension nor provided an expert

report.  [Doc. 67, p. 1]  Finally, on June 23, 2014, the docket reflects a *Certificate of*

*Service* filed by Plaintiff certifying that Plaintiff sent to Defense Counsel "Plaintiffs' Rule

26(a)(2) Disclosure of Expert Witness."  [Doc. 69]  On June 30, 2014, Plaintiff filed

another *Certificate of Service* certifying that Plaintiff sent to Defense Counsel "Plaintiffs'

Supplemental Rule 26(a)(2) Expert Disclosure."  [Doc. 77]

Federal Rule of Civil Procedure 37(c) provides:

(1) Failure to Disclose or Supplement. If a party fails to provide
information or identify a witness as required by Rule 26(a) or (e), the party
is not allowed to use that information or witness to supply evidence on a
motion, at a hearing, or at a trial, unless the failure was substantially
justified or is harmless. In addition to or instead of this sanction, the court,
on motion and after giving an opportunity to be heard:
(A) may order payment of the reasonable expenses, including attorney's
fees, caused by the failure;
(B) may inform the jury of the party's failure; and
(C) may impose other appropriate sanctions, including any of the orders
listed in Rule 37(b)(2)(A)(i)-(vi).

This Court has broad discretion in determining whether a Rule 26(a) violation is justified

or harmless.  *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985,

993 (10th Cir. 1999).  Though the Court "need not make explicit findings[,]" on whether

the failure was substantially justified or harmless, "the following factors should guide its

discretion: (1) the prejudice or surprise to the party against whom the testimony is

offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness." *Id.* (citations omitted).

Here, the main justification Mr. Mullins offers for his nearly two month late disclosure is that Defendant hired Plaintiff's Counsel's go-to expert out from under him. [Doc. 66, pp. 1, 3, 4, 5, 6] The Court concludes that Plaintiff's Counsel's failure to timely determine that his usual expert had been retained by Defendant does not substantially justify his late disclosure or his failure to request an enlargement of his deadline to disclose from the Court.   Had he been diligent, Plaintiff's Counsel would have determined that his expert had been retained by Defendant well in advance of his deadline to disclose an expert.   Further, Defendant agreed to, and the Court allowed, a two-week extension when Plaintiff requested one.   [Doc. 49; Doc. 50]   However, after this initial extension, Plaintiff's Counsel failed to either request another enlargement from Defendant or from this Court.   More egregiously, Plaintiff's Counsel, in his response to Defendant's Motion to Strike his Expert, again failed to request from the Court an enlargement based on the current circumstances or offer any time-frame in which he would comply with the Federal Rules of Civil Procedure or this Court's Scheduling Order.   [Doc. 66]   Even considering that Plaintiff's second-choice expert first had an emergency and then failed to provide a sufficient report [Doc. 66, p. 4], the Court cannot conclude that Plaintiff's Counsel's late disclosure or disregard of the procedures available to obtain an enlargement was substantially justified.

Additionally, the Court concludes that there is prejudice to Defendant from

12

Plaintiff's Counsel's conduct.  Because Plaintiff failed to request an enlargement from the Court, Defense Counsel had to incur the expense of filing the present motion. Further, had the Magistrate Judge allowed Plaintiff's late disclosure further delay would have been necessary to allow Defendant additional time to depose Plaintiff's expert, to allow Defendant to identify an expert, and to allow Plaintiff to depose Defendant's expert.  Thus, if the Court would have, at the time of the briefing, granted Mr. Mullins a *nunc pro tunc* extension, it likely would have required the Court to extend the deadlines for discovery and for filing pretrial motions.  Further, now if the Court were to not strike Plaintiff's expert, the delay would be even greater, as the parties would potentially need to supplement their motions for summary judgment based on the depositions of the experts.  This case has been pending since August of 2013, and thus, the Court concludes that such delay would be prejudicial.  *See Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 953-54 (10th Cir. 2002) (concluding that delay caused by incomplete expert reports was prejudicial).

The Court concludes that Plaintiff's late disclosure was not justified, that it is not harmless, and that the proper remedy is to strike Plaintiff's untimely designation of Mr. Seemann as an expert.  *See id.* (holding that the district court erred in failing to strike expert reports based on prejudice which could not be cured); Fed. R. Civ. P. 37(c)(1).

### *Summary Judgment:  Assault and Battery; NMUPA; Punitive Damages*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[A] party seeking summary judgment always bears the

initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted); *see also Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998).  Once the movant meets this burden, the non-moving party is required to put in the record facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); Fed. R. Civ. P. 56(c).

"A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit.  A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented."  *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008) (internal citations omitted).

> The trial judge is not to weigh the evidence to determine the truth of the matter, but instead must ask "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." [*Liberty Lobby*, 477 U.S.] at 252, 106 S.Ct. at 2512. In making the decision, the trial judge must consider all the evidence in the light most favorable to the nonmoving party. *Redhouse v. Quality Ford Sales, Inc.*, 511 F.2d 230, 234 (10th Cir.1975). Thus, the trial judge must deny motions for summary judgment when reasonable jurors might disagree, even though the judge as trier of fact would find for the moving party.

*Dreiling v. Peugeot Motors of Am., Inc.*, 850 F.2d 1373, 1377 (10th Cir. 1988).

In order for his battery claim to survive, Mr. Mullins must produce evidence that Defendant acted "intending to cause a harmful or offensive contact with [Mr. Mullins] . . . or an imminent apprehension of such a contact, and an offensive contact with the person of the other directly or indirectly results."  *Varnell v. Dora Consol. Sch. Dist.*, 756 F.3d

14

1208, 1216 (10th Cir. 2014) (internal quotation marks and citation omitted).[3]   Plaintiff relies on *Mathias v. ACCOR Economy Lodging, Inc.*, 347 F.3d 672 (7th Cir. 2003), in which the Seventh Circuit concluded it could be a battery for a hotel to rent a room to guests which it knows is infested with bedbugs.  *Id.* at 675.  In *Mathias*, a hotel rented to the plaintiffs a room which had been reported to have bedbugs, had been tagged as "DO NOT RENT UNTIL TREATED," and had not yet been treated.  *Id.*  Additionally, prior to the plaintiffs' stay, the hotel knew that it had a hotel-wide bedbug infestation which had grown over the course of two years, and though its pest control service had offered early on to spray every room for only $500, that offer was refused.  *Id.* at 674-75.  The problem grew until motel management admitted that, as of a few months before the plaintiffs' stay, there was "a major problem with bedbugs and that all that was being done about it was chasing them from room to room."  *Id.* at 675 (internal quotation marks omitted).  On the night the plaintiffs stayed at the hotel, "190 of the hotel's 191 rooms were occupied, even though a number of them had been placed on the same don't-rent status" as the plaintiffs' room.  *Id.*  Under those circumstances, the Seventh Circuit

---

[3] Thus far in the case, the parties have not cited to Nevada law as the applicable tort law. This Court looks to New Mexico conflicts of law principles to determine which law applies.  *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Pepsi–Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).  In this tort case New Mexico would apply "the law of the place where wrong occurred." *Terrazas v. Garland & Loman, Inc.*, 142 P.3d 374, 377 (N.M. Ct. App. 2006).  Thus, Nevada law applies to Mr. Mullins' tort claims.  The Court concludes that the Nevada law of battery is, like that of New Mexico, based on the common-law understanding of the tort of battery.  *See Olivero v. Lowe*, 995 P.2d 1023, 1026-27 (Nev. 2000) (discussing assault and battery generally); *see also Walker v. Burkham*, 222 P.2d 205, 215 (Nev. 1950) (referring to the Restatement of Torts in considering battery claim and defenses to the battery claim).

affirmed a jury verdict of $186,000, based on the "willful and wanton conduct" of the hotel. *Id.* (internal quotation marks omitted).

Mr. Mullins argues that this case fits within the fact pattern of *Mathias*, and that he has produced evidence allowing this Court to infer that 11% of Defendant's rooms had been infested by bedbugs. Mr. Mullins does not, however, provide record evidence to support this calculation as required by Rule 56(c). [Doc. 107, pp. 8-9] Mr. Mullins submits that "Defendant has produced approximately 134 customer reports of bedbug infestations for approximately two years prior to Plaintiffs' incident." [Doc. 107, p. 7 ¶ 16] Again, Mr. Mullins did not provide these reports to the Court, thus, he has not produced any evidence to support this assertion. [Doc. 107, p. 7, ¶ 16] Defendant disputes Mr. Mullins number, and instead claims that there were 36 customer reports of bedbugs between 2009 and 2011. [Doc. 124, p. 3; Doc. 126, p. 6, ¶ 16] Defendant states that while there were 134 pages of reports, those reports pertain only to 36 complaints (only 23 of which occurred after Defendant purchased the hotel in March of 2010), and Defendant produces a summary sheet listing each complaint by room number, date of complaint, and the bates number for the document supporting the report. [Doc. 126, p. 6, ¶16; Doc. 126-4] Because Defendant has pointed to specific documents which indicate both the number of bedbug infestations and the room numbers of the infestation, Mr. Mullins' unsupported argument is insufficient. He has failed to meet his burden of establishing either a significant hotel-wide infestation or a known infestation in room 624. *Liberty Lobby,* 477 U.S. at 250.

Mr. Mullins also points to testimony by Defendant's housekeeping manager that

the housekeepers were not required to complete a form or to record that a room had bedbugs.  [Doc. 102-2, p. 8, 102:2-5]  Defendant's housekeeping staff are required to clean 17 rooms per one eight hour shift, and their supervisor has not asked them whether that is sufficient time to clean the rooms and inspect for bedbugs.  [Doc. 102-2, p. 4; 26:1-9; Doc. 102-2, p. 14, 132:4-19]  Defendant's housekeeping manager also could not explain why the housekeeping staff failed to detect the bedbugs when cleaning the room between Plaintiffs' stay and the subsequent customer's stay.  [Doc. 102-2, p. 13, 125:1-24]  Finally, Mr. Mullins offers deposition testimony that Defendant's staff did not refer to bedbugs as bedbugs, but as "yoggies."  [Doc. 102-2, p. 5, 35:10-11]  The Court concludes that, while the nickname for bedbugs may evince Defendant's intention to hide the presence of bedbugs from its customers, without evidence that Defendant knew it was exposing Plaintiffs to bedbugs, Mr. Mullins cannot establish his claim of battery.

Additionally, simple mathematics illustrate that, even were the Court to ignore Mr. Mullins' burden on summary judgment and assume the truth of his unsupported claims, Mr. Mullins could not establish that Defendant had a severe bedbug infestation like that in *Mathias*.  The Tropicana has 1,487 rooms, and there was a 2 year or 730 day period for which bedbug reports were produced.  Multiplying the number of rooms by the number of days possible for which there may have been reports of bedbugs, there was the potential for 1,085,510 exposures to bedbugs ("room-days").  Mr. Mullins submits that over this period there were 134 reports (though he offers no record evidence to support this claim).  Were the court to be even more solicitous to Mr. Mullins and arbitrarily assume that, for each customer report, bedbugs were present in the room for 30 days prior

to the report (though Plaintiff has not and cannot produce expert testimony to support such an assumption), there were up to 4020 potential bedbug exposures (134 reports multiplied by 30 days, resulting in "bedbug room-days"). Dividing 4020 by 1,085,510, there was less than a .4 percent likelihood of a customer of the Tropicana being bitten by bedbugs. Thus, even granting all reasonable inferences to Mr. Mullins' unsupported arguments, Defendant could safely assume that 99.6% of the time its customers were not exposed to bedbugs. In *Mathias*, the evidence suggested that it was more likely than not that any customer would be bitten by bedbugs, and, moreover, nearly certain that the plaintiffs would be bitten, because they were rented a room known to be infested with bedbugs but not yet treated. *Mathias*, 347 F.3d at 675. Accordingly, Mr. Mullins has failed to produce evidence that Defendant knew or should have known he would be bitten by bedbugs, and thus his battery claim fails. *See, e.g., Livingston v. H.I. Family Suites, Inc.*, 2006 WL 1406587, *4 (M.D. Fl. 2006) (unpublished decision) (concluding that the plaintiffs failed to come forward with evidence that the defendants knew with substantial certainty that the plaintiffs would be bitten by bedbugs and thus dismissing their assault and battery claim; distinguishing *Mathias*).

Similarly, because Mr. Mullins failed to produce evidence of Defendant's knowledge that the room it provided to him was infested or likely to be infested with bedbugs, Defendant is entitled to summary judgment on Mr. Mullins NMUPA claim. *Stevenson v. Louis Dreyfus Corp.*, 811 P.2d 1308, 1311-12 (N.M. 1991) (explaining that, to establish a false or misleading statement under the NMUPA, the defendant must have had knowledge that it made a false or misleading statement at the time the statement was

made or the defendant should have discovered the statement was false or misleading through the exercise of reasonable diligence).   Likewise, Mr. Mullins has failed to produce evidence of a willful or wanton state of mind by Defendant, and thus Defendant is entitled to summary judgment as to punitive damages.  *See Grogan v. Gamber Corp.*, 858 N.Y.S.2d 519, 526-27 (Sup. Ct. N.Y. Co. 2008) (concluding that the plaintiffs were not entitled to punitive damages for bedbug claim where there was not evidence of reckless abandon; distinguishing *Mathias*); *Light v. W2001 Metro. Hotel Realty LLC*, 2011 WL 2175778 *4 (S.D.N.Y. 2011) (unpublished decision) (holding that there was not evidence that the hotel knowingly exposed the plaintiff to bedbugs; distinguishing *Mathias*).

### *Summary Judgment:  Negligence*

In addition to the above evidence, Mr. Mullins offers the following evidence in support of his argument that Defendant was negligent.  Plaintiffs stayed in room 624 from December 14 through December 17, 2011.  [Doc. 87, ¶ 1]  Based on the sheer number of bites to Ms. McQuitty, several hundred over her stay, Mr. Mullins argues there is evidence of a significant bedbug infestation.  [Doc. 88, ¶ 11]  The housekeepers are expected to inspect every room between guests, yet they continued to fail to detect the bedbugs after Plaintiffs left, because the subsequent guest also found bedbugs.  [Doc. 88, ¶ 16; Doc. 102, ¶ 18]  Finally, Defendant's housekeeping staff must clean 17 rooms in eight hours, and the housekeeping supervisor has not ensured that the housekeepers had sufficient time to clean the rooms.  [Doc. 102, ¶¶ 11-13]

The Court concludes that this evidence alone, without expert evidence on the

nature of bedbugs, bedbug infestations and bedbug inspections and management, is not sufficient to survive summary judgment.  The Court concludes that a jury would not be able to determine whether the housekeeping staff could or should have been able to detect the presence of bedbugs before Plaintiffs stayed in room 624 on lay evidence alone.  In this case, evidence as to the size, life cycle, biting habits, hiding places and habits, nocturnal (or other) nature, and detectability of bedbugs would be critical to explain whether the number of bites Plaintiffs suffered was likely from a small or large infestation or whether Defendant's inspection practices were reasonable and in conformance with industry practices.[4]  This is specialized knowledge, not generally known to most jurors.  Mr. Mullins expert has been stricken pursuant to Federal Rule of Civil Procedure 37(c), and he has offered no other witness who is able to provide the requisite testimony.  Fed. R. Evid. 701 ("If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; . . . and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."); *Felkins v. City of Lakewood*, 774 F.3d 647, 651-52 (10th Cir. 2014) (applying Rule 701; concluding that lay witness could not testify that she had particular medical condition).

Mr. Mullins has failed to meet his burden on summary judgment to produce evidence of Defendant's negligence, and his negligence claim will be dismissed.

---

[4] Nor can Mr. Mullins rely on the publications by the Purdue University Extension and the Utah State University Extension attached to his reply brief [Doc. 123-1; Doc. 123-2] without expert testimony to lay a foundation to bring the statements within a hearsay exception.  Fed. R. Evid. 803(18).

*Plaintiffs' Motion for Summary Judgment*

Plaintiffs moved for summary judgment on their negligence claim, battery claim, and their claim under the NMUPA.  As explained above, Mr. Mullins failed to produce evidence sufficient to withstand summary judgment on all of his claims.  For the same reasons, he is not entitled to summary judgment.   Fed. R. Civ. P. 56(a).

**CONCLUSION**

**WHEREFORE, IT IS HEREBY ORDERED THAT:**

1)      *Plaintiffs' Motion for Partial Summary Judgment* [Doc. 88] is **DENIED**;

2)      *Plaintiffs' Motion for Sanctions and Adverse Inference from Defendant['s] Spoliation of Evidence or, in the [Alternative], Motion to Conform the Pleadings to the Evidence or to Amend the Complaint to Add a Spoliation Claim* [Doc. 80] is **DENIED**;

3)      *Tropicana Express, LLC's Motion to Bar Expert Testimony* [Doc. 58] is **GRANTED**;

4)      *Tropicana Express, LLC's Motion for Partial Summary Judgment on Intentional Tort, UPA, and Punitive Damages Claims* [Doc. 84] is **GRANTED**; and

5)      *Tropicana Express, LLC's Motion for Partial Summary Judgment on Negligence Claim* [Doc. 86] is **GRANTED**.

**SO ORDERED** this 25th day of March, 2015 in Albuquerque, New Mexico.

_____
M. CHRISTINA ARMIJO
Chief Judge, United States District Court